# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### February 29, 2012 Session

## STATE OF TENNESSEE v. MARIO JONES

**Direct Appeal from the Criminal Court for Bradley County**
**No. M-03-628      Carroll L. Ross, Judge**

---

**No. E2011-00123-CCA-MR3-CD - Filed September 26, 2012**

---

A Hamilton County jury convicted Defendant, Mario Jones, of possession of more than 50 grams of a Schedule II controlled substance with intent to sell, a Class A felony. The trial court sentenced Defendant to serve twenty years as a Range I standard offender.  In his appeal, Defendant presents the following issues for review: (1) the stop of Defendant's vehicle and the subsequent detention of Defendant violated his constitutional rights, and the trial court erred by denying Defendant's motion to suppress; (2) the evidence was insufficient to sustain Defendant's conviction; (3) the trial court improperly allowed Lieutenant Queen to testify concerning the calendar, notes, and pills found in Defendant's vehicle; (4) the trial court erred in finding that chain of custody had been established; and  (5) the trial court erred in rejecting Defendant's proposed mitigating factor.  After a thorough review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JERRY L. SMITH and ROGER A. PAGE, JJ., joined.

Robin Ruben Flores, Chattanooga, Tennessee (on appeal), and Eileen M. Parrish, Nashville, Tennessee, and Daniel J. Ripper, Chattanooga, Tennessee (at trial), for the appellant, Mario Jones.

Robert E. Cooper, Jr., Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Jerry N. Estes, District Attorney General; Stephen Hatchett, Dorothy At well, and Shari Taylor Young, Assistant District Attorneys General, for the appellee, the State of Tennessee.

## OPINION

### I. Background

*Suppression Hearing*

Lieutenant Bobby Queen of the 10th Judicial Drug Task Force ("DTF") testified that he observed Defendant traveling southbound on Interstate 75 (I-75) in a white GMC Yukon "following approximately one car length off the vehicle in front of him at approximately 70 miles per hour." Lieutenant Queen and his partner, Agent Fred Sullivan, a member of the Tennessee National Guard Counter-Drug Division, were parked in the median at mile marker 29, pulled out and caught up with Defendant's vehicle as Defendant exited the interstate at Exit 27. Lieutenant Queen followed Defendant to a BP gas station where Defendant pulled in and began pumping gas. Lieutenant Queen testified that he activated his blue lights, approached Defendant, informed him of the reason for the stop, and asked for his license and registration. Defendant produced his license and a registration indicating that the vehicle did not belong to him. He also appeared to be scared, was very vague, and he avoided eye contact.

Lieutenant Queen told Defendant to "continue doing whatever he needed to do," and Lieutenant Queen walked back to his car and "ran the information on the traffic stop that [he] normally [did] through the Blue Lightning Operations Center BLOC, and [he] waited for that information to return." Lieutenant Queen explained that the Blue Lightning Operations Center (BLOC) covered a large "variety" of data from the federal and state governments, "on driver's licenses, wanted persons, criminal histories, text information on possible suspects in federal cases, border crossings, any information that the federal government has." Defendant finished pumping gas while Lieutenant Queen waited for the information to return. Defendant then walked inside the store for "four or five minutes, and then he returned back out and waited a short period of time till [Lieutenant Queen] got the information back." Lieutenant Queen testified that the process took 10 to 15 minutes, and he learned that Defendant had a criminal history. The registration for the Yukon was not on file. Lieutenant Queen said that while he processed Defendant's information, Agent Sullivan filled out a warning citation for the traffic violation of following too closely.

Lieutenant Queen testified that he explained the warning citation to Defendant, returned his license and registration, and then asked for consent to search Defendant's vehicle. He said that Defendant made a hand gesture and said, "Go ahead." Lieutenant Queen immediately began searching Defendant's vehicle while Defendant stood by Lieutenant Queen's vehicle and talked with Agent Sullivan. Lieutenant Queen testified:

I started searching the passenger's compartment on the passenger's side, and immediately, I found a document that showed that [Defendant] had lied to me about where he was coming from. It's not, not a crime, but it does show deception. The place he told me that he was coming from was, I'd never heard of. The place that showed where he was coming from, which was a George Washington Bridge crossing receipt, where you have to pay a toll to cross the George Washington Bridge in New York City. I found that in his - - and it was for the day before. I found that in his vehicle, which told me that he'd lied about his, his travel itinerary, and that he was actually coming from New York City. This is common. It's common when I run across smugglers to lie about their travel itinerary. They don't want me to know where they're coming from and where they're going.

Lieutenant Queen also found documents that showed "large amounts of money or, or large figures, which is also common among smugglers." In the back seat floor area, he found an "Aqua Net" hair spray can and a "Gunk Fix-a-Flat" can. Lieutenant Queen inspected the cans and found them to be what is referred to as "California safes." He noted that the two cans had removable false bottoms that were made to hides items. Lieutenant Queen testified that he found large plastic bags in the cans containing yellow tablets. At that moment, he placed Defendant under arrest.

Lieutenant Queen testified that he initially thought the pills in the bags were ecstasy. He communicated this thought to another agent, and Defendant interrupted and said, "It's pharmaceutical." Lieutenant Queen then looked up the pills in the Physician's Desk Reference (PDR) and learned that they were K4 Dilaudids, a Schedule II narcotic. Lieutenant Queen later learned that the vehicle that Defendant was driving at the time of the stop was stolen from a car lot. Defendant had said that he borrowed the vehicle from someone, and "he knew how much of a lien it had on it." Lieutenant Queen testified that he forgot to turn his microphone on until the very end of the stop, and the batteries immediately went dead. He said that Agent Fred Sullivan, who was wearing plain clothes and a vest, was armed at the time of the stop but his weapon was concealed. Lieutenant Queen testified that he was wearing a t-shirt that read, "Drug Task Force" and had "Police" on the shoulders. He was also wearing his "gun belt and a, an outer vest with cargo pockets for flashlights and stuff." Lieutenant Queen testified that he and Agent Sullivan hand-counted the Dilaudid pills and came up with a total of 6,702.

*Hearing on Motion to Dismiss - Chain of Custody*

Lieutenant Bobby Queen testified that he seized three bags of K4 Dilaudids, a form a morphine, in the present case on June 27, 2002. At the time, he and Agent Sullivan did a

preliminary count of the pills, which was 6,702. Lieutenant Queen placed the pills in a tamper-proof evidence bag "with an additional seal above and beyond what comes with the bag, with [his] initials on both the bag and the seal." At the hearing, Lieutenant Queen did not notice anything different about the bag other than the TBI seal. He did not see any sign of tampering with the bag. Lieutenant Queen then dropped the sealed bag into their "mailbox," which was a locked U.S. mailbox, given to them by the Postal Service, which was bolted outside of the evidence room, for pickup by the evidence technician, Director Ken Wilson. He said that Director Wilson, the only person who had access to the container, then logged the evidence into the evidence room, and it was later transported to the TBI crime lab. Lieutenant Queen testified that after the evidence was analyzed, it would be brought back to the DTF office and logged back into the evidence room. He said that the official count of the pills from the TBI crime lab was 6,992.

On cross-examination, Lieutenant Queen testified that between December of 2000 and September of 2002, some marijuana was taken from the evidence room. He explained that the evidence at that time had already been "through the judicial process" and was ready for destruction. Lieutenant Queen testified that some time around August 16, 2002, he approached Director Wilson about the missing evidence.

Kenneth Wilson testified that he was the Director of the DTF in 2002. His job was to "make sure everything was going okay, logged into evidence, different, different things." Most of the time, he was the one who took evidence to the TBI crime lab for testing. Mr. Wilson did not specifically recall taking evidence from the present case to the lab, but he said that he did not tamper with the evidence. He said that it would be impossible for him to have tampered with the evidence because "it would show up anywhere it had been cut or whatever on the bag, and you could tell that it had been cut and resealed."

On cross-examination, Mr. Wilson acknowledged that he was serving a 78-month sentence in federal prison for conspiracy to deliver and distribute marijuana. He was arrested for the offense in August of 2002. Mr. Wilson admitted that he was the only person who had access to the evidence in the present case when the evidence was located in the evidence room. He also admitted that he may have been intoxicated while on the job during the "last part" of his tenure with the DTF, but he said that he was not drunk when handling evidence. Mr. Wilson testified that the evidence in the present case that was logged in the evidence room on July 9, 2002, would have remained in the evidence room until it was taken to the TBI crime lab on August 16, 2002. Concerning the daily accounting of the evidence in the locker room, Mr. Wilson testified: "It's under lock and key, and it's on a secure pad. And you can go back and check who had been in the evidence locker, I'm sure, you know, through the, the alarm company."

Special Agent Brett Trotter, a forensic scientist with the TBI crime lab, testified that the lab would not accept an evidence bag that was not sealed. He said that the bag in the present case was sealed when it was placed into the evidence vault, and it remained sealed until he used a scalpel to open the bottom of the bag. He initialed and resealed the bag after analyzing its contents. Special Agent Trotter did not see any signs of tampering on the bag. He also said that it would be "extremely difficult to impossible" to tamper with the bag and the tampering not be discovered.

On cross-examination, Special Agent Trotter testified that he used an electronic, top-loading balance to obtain the weight of the pills. He said:

> I would have obtained a weight of all of these tablets, and then I would have weighed a particular number, and easily countable number of tablets and obtained an average weight of each tablet. I then would have multiplied the weight that I obtained for the total weight of all the tablets by the average weight of an individual tablet - - -

He admitted that he did not physically count each pill. Special Agent Trotter testified that he would not know if the number of pills obtained by Lieutenant Queen was correct or his count was correct. He said that he "put an approximate sign by the number of tablets," and that was why he included the weight on his report. The approximate number of tablets was 6,994, and the total weight was 629.5 grams. Special Agent Trotter felt that the weight was most accurate because the scales at the crime lab were verified weekly. He confirmed that Ken Wilson delivered the bag to the TBI lab on August 16, 2002.

*Trial*

Lieutenant Queen's testimony at trial was mostly a repeat of the facts he had given during his testimony at the suppression hearing. At trial, he testified that on June 27, 2002, Defendant was traveling "approximately one car length or less off a vehicle in front" of him when Lieutenant Queen first observed him on I-75. Lieutenant Queen explained that he had worked "strictly narcotics since 1992," and he had worked drug interdiction on the interstate during that time. He said that following too closely was one of the more common violations with a "drug smuggler." Lieutenant Queen followed Defendant as he exited the interstate at Exit 27, pulled into the parking lot of a BP gas station, and stopped at the gas pumps. Because Defendant was already stopped, Lieutenant Queen did not activate his overhead blue lights, "just the rears to keep - - so anybody behind [him] would know that [he] wouldn't be moving." Lieutenant Queen approached the vehicle and had a conversation with Defendant. He said:

The initial purpose of the conversation was the, the traffic stop, was the violation that he had con - - that he's done on, while he was on I-75. And I asked him for his license and registration, proof of insurance, and discussed the violation with him. And during this time, he just wouldn't look at me. I mean, he couldn't look me in the eye. He just, almost like I wasn't there. He would answer, but he - - it was almost like he was just . . . he didn't acknowledge my presence other than answering.

Lieutenant Queen testified that he was not familiar with the location Defendant said that he was traveling from, and Defendant said that his destination was in Mississippi.

Lieutenant Queen testified that after talking with Defendant, he went back to his vehicle and began checks of Defendant's license "and things of that nature through a place called BLOC." Lieutenant Queen testified that after he received information back through BLOC, and Defendant was issued a warning citation, he asked Defendant for permission to search the Yukon, and Defendant said, "Okay." The search was recorded on video. During the search, Lieutenant Queen found a can of "GUNK Big Puncture Seal" and a can of "Aqua Net" laying on the floor of the SUV, which he discovered had false bottoms and were known as a "California safe[s]." He said that there was a large bag of yellow pills in the "GUNK" can, and he also found two bags of pills in the "Aqua Net" can.

Lieutenant Queen testified that Defendant had approximately $970 cash at the time of his arrest. Lieutenant Queen also found documents in Defendant's vehicle that consisted of a pocket calendar and a notepad from a Best Western Motel. He said that based on his training and experience, the documents appeared to reflect "notes of sale and notes of, where he keeps up with who owes him, who's getting what, as far as the narcotics and the money. He had seen that type of documentation in previous drug cases "[a]lmost every time." Lieutenant Queen testified, "I have done a lot of search warrants. I was an investigator for eight years with the City of Cleveland, a narcotics investigator, from '92 to 2000." He noted that he would often find ledgers or financial records of drug dealers during the execution of search warrants. Lieutenant Queen testified that he also found a receipt in Defendant's vehicle from the Port Authority of New York City showing that Defendant had recently crossed the George Washington Bridge. There was also a handwritten note that read, "Metro Medical Skyline Plaza, first floor" and a receipt in Defendant's name from a Holiday Inn in Clinton, New Jersey with an arrival date of June 25, 2002, and a departure date of June 26, 2002. Defendant never told Lieutenant Queen that he had been in New Jersey.

Lieutenant Queen testified that he and an agent with the National Guard Counter Drug Division performed a quick count of the three bags of pills found in Defendant's vehicle and determined that there were 2,540 pills in the first bag, 2,717 in the second bag, and 1, 445

in the third. He acknowledged that he initially thought that the pills were ecstasy, but Defendant stated at the DTF office that they were "pharmaceuticals." He later looked them up in the PDR and identified them as Dilaudid. Lieutenant Queen testified that he placed the pills in an evidence bag which he sealed, initialed, and dated. He then placed the bag in a secure evidence container for pick up by the evidence custodian, Director Ken Wilson. Lieutenant Queen noted that Ken Wilson was in federal prison at the time of trial. He said that he turned Mr. Wilson in for stealing cocaine and marijuana from the drug task force evidence room. Lieutenant Queen testified that there was no evidence that Mr. Wilson tampered with the evidence in Defendant's case, and the evidence bag that he turned in did not exhibit any signs of tampering.

Lieutenant Queen testified that Defendant said that the Yukon that he was driving belonged to a friend or a cousin, and he gave Lieutenant Queen an address and phone number. Lieutenant Queen made several attempts to contact the person but was unsuccessful. He said that an investigator with the Tennessee Highway Patrol located two different VIN numbers on the vehicle. It was determined that the vehicle was stolen from a car lot.

TBI Special Agent Brett Trotter's testimony at trial was also similar to his testimony at the suppression hearing. He identified the evidence bag from the present case and testified that he personally received it from Ken Wilson at the TBI crime lab in Chattanooga on August 16, 2002, at 2:20 p.m. He said that the bag, which indicated that the items were seized on June 27, 2002, exhibited no signs of tampering when it was submitted, and he immediately placed it in the evidence vault. Special Agent Trotter testified that he later retrieved the bag from the vault, cut the bottom with a scalpel, and weighed the pills inside. He said:

> I weighed the contents, which were described as yellow tablets. I then calculated an average weight of each tablet by taking like 10 to 20 of them, something that was easy to count out, obtained how much each tablet weighed itself, and I divided the weight of all the tablets in order to calculate how many tablets were present in total. In all three bags, I found that there were 6,994 tablets, which total weight was 629.58 grams. I then did a visual examination of the tablets, and they had markings on them, markings on them which were consistent with pharmaceutical markings. I then used a reference material in our laboratory to help me identify those markings, and in this particular case, there was a controlled substance indicated to be present, hydromorphone. I then took one of the tablets, crushed it and extracted it, and used instrumentation in our laboratory to confirm what the reference material had indicated the tablets were.

He said that hydromorphone is the scientific term for Dilaudid, which is a Schedule II controlled substance in the State of Tennessee.

Defendant did not testify or present any other evidence.

## II. ANALYSIS

*Motion to Suppress Evidence*

Defendant argues that the trial court committed reversible error by failing to suppress evidence of the drugs found in his vehicle. The findings of fact made by the trial court at the hearing on a motion to suppress are binding upon this Court unless the evidence contained in the record preponderates against them. *State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence and resolve any conflicts in the evidence. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). However, this Court is not bound by the trial court's conclusions of law. *State v. Simpson*, 968 S.W.2d 776, 779 (Tenn. 1998). The application of the law to the facts found by the trial court are questions of law that this court reviews *de novo. State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000).

Under both the federal and state constitutions, a warrantless search and seizure is presumed unreasonable, and the evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search and seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement. *State v. Binette*, 33 S.W.3d 215 (Tenn. 2000).

*A. Initial Stop*

"A police officer may make an investigatory stop of a motor vehicle when the officer has reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed." *State v. Watkins*, 827 S.W.2d 293, 294 (Tenn. 1992) (citing *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868 (1968)). "In determining whether a police officer's reasonable suspicion is supported by specific and articulable facts, a court must consider the totality of the circumstances." *Watkins*, 827 S.W.2d at 294 (citing *U.S. v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 629 (1981)). This inquiry looks to such factors as the public interest served by the seizure, the nature and scope of the intrusion, and the objective facts on which the law enforcement officer relied in light of his experience. *See State v. Pulley*, 863 S.W.2d 29, 30-31 (Tenn. 1993). The objective facts on

which an officer relies can include, but are not limited to, his or her own observations, information obtained from other officers or agencies, offenders' patterns of operation, and information from informants. *See State v. Lawson*, 929 S.W.2d 406, 408 (Tenn. Crim. App. 1996). Reasonable suspicion must be supported by something more than the officer's "inchoate and unparticularized suspicion or 'hunch.'" *State v. Day*, 263 S.W.3d 891, 902 (Tenn. 2008) (quoting *Terry*, 392 U.S. at 27, 88 S.Ct. 1868). However, "'reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause'" and "can arise from information that is less reliable than that required to show probable cause." *Id*. at 903 (quoting *Pulley*, 863 S .W.2d at 32).

Tenn. Code Ann. § 55-8-124(a) provides that a "driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon and the condition of the highway." Violation of this section is a Class C misdemeanor. Tenn. Code Ann. § 55-8-124(e). In this case, Lieutenant Queen testified that he stopped Defendant for following too closely. He said that he observed Defendant traveling southbound on I-75 in a white GMC Yukon "following approximately one car length off the vehicle in front of him at approximately 70 miles per hour." He said that Defendant remained approximately one car length behind the vehicle in front of him for approximately one and a half miles until Defendant exited the interstate. Lieutenant Queen testified that he was behind Defendant the entire time attempting to catch up to him. This constituted reasonable suspicion for Lieutenant Queen to stop Defendant's vehicle.

Defendant further contends that the stop of his vehicle was pretextual. However, it is well-settled that as long as there is probable cause or reasonable suspicion to stop a vehicle on a valid basis, it does not matter if that reason is pretextual to investigate for illegal drugs. *See State v. Orson Wendell Hudson*, No. M2004-00077-CCA-R3-CD, 2005 WL 639129, at *3 (Tenn. Crim. App. Mar. 15, 2005)("An officer's subjective intention for stopping a vehicle is irrelevant, as long as independent grounds exist for the detention.")(citing *Whren v. United States*, 517 U.S. 806, S.Ct.1769, 135 L.Ed.2d 89 (1996)); *State v. Vineyard*, 958 S.W.2d 730 (Tenn. 1997)). Defendant is not entitled to relief on this issue.

### B. Unlawful Detention

If an officer's initial stop of an individual is justified, then it must next be determined whether the seizure and search of the individual are "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20. The detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983). "[T]he proper inquiry is whether during the detention, the police diligently pursued a means of investigation that was likely

to confirm or dispel their suspicions quickly." *State v. Simpson*, 968 S.W.2d 776, 783 (Tenn. 1998). If "the time, manner or scope of the investigation exceeds" the ambit of reasonableness, a constitutionally permissible stop may be transformed into one which violates the Fourth Amendment and article 1, section 7 of the Tennessee Constitution. *State v. Troxell*, 78 S.W.3d 866, 871(Tenn. 2002)(quoting *United States v. Childs*, 256 F.3d 559, 564 (7th Cir. 2001); *see also State v. Morelock*, 851 S.W.2d 838, 840 (Tenn. Crim. App. 1992). However, "no hard-and-fast time limit exists beyond which a detention is automatically considered too long and, thereby unreasonable." *State v. Justin Paul Bruce*, No. E2004–02325–CCA–R3–CD, 2005 WL 2007215, at *7 (Tenn. Crim. App., Knoxville, Aug. 22, 2005); *see also United States v. Sharpe,* 470 U.S. 675, 685 (1985) ("[I]f an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop.").

In Tennessee, "requests for driver's licenses and vehicle registration documents, inquiries concerning travel plans and vehicle ownership, computer checks, and the issuance of citations are investigative methods or activities consistent with the lawful scope of any traffic stop." *State v. Gonzalo Garcia*, No. M2000–01760–CCA–R3–CD, 2002 WL 242358, at *21 (Tenn. Crim. App., Nashville, Feb. 20, 2002) (citations omitted), *overruled on other grounds by State v. Garcia,* 123 S.W.3d 335 (Tenn. 2003).

Defendant contends that the "officers exceeded the scope of the stop by the continued detention." However, the trial court determined that "the [d]efendant was not detained for a period longer than that necessary to effectuate the reason for the stop." The record supports the trial court's finding. Lieutenant Queen testified that he approached Defendant, informed him of the reason for the stop, and asked for his license and registration. He said that Defendant appeared to be scared, was very vague, and he avoided eye contact. Lieutenant Queen told Defendant to "continue doing whatever he needed to do," and Lieutenant Queen walked back to his car and "ran the information on the traffic stop that [he] normally [did] through the Blue Lightning Operations Center BLOC, and [he] waited for that information to return." Defendant finished pumping gas while Lieutenant Queen waited for the information to return, and Defendant then walked inside the store for "four or five minutes, and then he returned back out and waited a short period of time till [Lieutenant Queen] got the information back." Lieutenant Queen testified that the entire process took 10 to 15 minutes, and he learned that Defendant had a criminal history, and the registration for the Yukon was not on file. Lieutenant Queen said that while he processed Defendant's information, Agent Sullivan filled out a warning citation for the traffic violation of following too closely. Lieutenant Queen explained the warning citation to Defendant, returned his license and registration, and then asked for consent to search Defendant's vehicle. He said that Defendant made a hand gesture and said, "Go ahead." Lieutenant Queen immediately began searching Defendant's vehicle.

We conclude that the circumstances in this case did not create an unreasonable detention. Lieutenant Queen did not detain Defendant any longer than necessary to conduct the stop. The stop concluded once Defendant received the warning citation at which time Defendant contemporaneously gave consent for Lieutenant Queen to search his vehicle, and the request to search Defendant's vehicle was appropriate under the circumstances. *See State v. Winford McLean*, No. E2010-02579-CCA-R3-CD, 2011 WL 5137177, at *6 (Tenn. Crim. App. Oct. 28, 2011)(Defendant's overall nervous demeanor and criminal history as a "known drug violator" justified officer's request for consent to search after the traffic stop lasted 26 minutes); *State v. Kenneth L. Davis*, No. W2008-00226-CCA-R3-CD, 2009 WL 160927, at *4 (Tenn. Crim. App., Jan. 23, 2009) *perm. app. denied* (Tenn., June 15, 2009)("The actual issuance of the citation occurred almost simultaneously with [the officer's] request to search. The Defendant's detention was not unreasonable."); and *State v. Christian Fernandez*, No. E2006-01781-CCA-R3-CD, 2007 WL 3072910, at *6 (Tenn. Crim. App. Oct. 23, 2007) *no. perm. app. filed* ("The officer's request for consent in this case was sufficiently contemporaneous with the issuance of the citation, such that there was no appreciable delay, and certainly no unreasonable delay."). Defendant is not entitled to relief on this issue.

### *Sufficiency of the Evidence*

Defendant argues that the evidence was not sufficient to sustain his conviction of possession of more than 50 grams of a Schedule II controlled substance with intent to sell. Specifically, Defendant bases his argument on his assertions that the custodian of evidence, Director Ken Wilson, who had been convicted of stealing a large amount of marijuana from the evidence room, had access to the evidence in this case, and there was a discrepancy between Lieutenant Queen's and the TBI crime lab's count of the pills.

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. *See State v. Evans*, 108 S.W.3d 231, 237 (Tenn. 2003); *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. *See Carruthers*, 35 S.W.3d at 558; *Hall*, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. *See Evans*, 108 S.W.3d at 236; *Bland*, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. *See Evans*, 108 S.W.3d at 236-37; *Carruthers*, 35 S.W.3d at 557. "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of [the] evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

Tennessee Code Annotated section 39-17-417(a)(4) sets forth that it is a criminal offense for a person to knowingly possess a controlled substance with the intent to sell it. "It may be inferred from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing." Tenn. Code Ann. § 39-17-419. In this case, Lieutenant Queen found three bags of yellow pills in two false-bottom cans in Defendant's vehicle. Although he initially thought that they were ecstasy pills, Defendant informed him that they were "pharmaceutical." Lieutenant Queen then looked the pills up in the Physician's Desk Reference and determined that they were Dilaudid pills, a Schedule II controlled substance. He and Agent Fred Sullivan performed a "quick" count of the pills and determined that there were 6,702 pills. Lieutenant Queen placed the pills in a locked evidence container in a sealed, tamper-proof evidence bag. The bag was later taken to the TBI Crime Lab for analysis. In the search of Defendant's vehicle, Lieutenant Queen also found a pocket calendar and a notepad from a Best Western Motel that appeared to reflect notes of narcotics transactions.

Special Agent Brett Trotter performed a chemical analysis of the pills and confirmed that they were Dilaudid. He also weighed the pills and determined that they weighed 629.5 grams. Special Agent Trotter testified that he did not count each individual pill but he "calculated the weight of each tablet by taking like 10 to 20 of them, . . ., obtained how much each tablet weighed itself, and [he] divided the weight of all the tablets in order to calculate how many tablets were present in total." He found that there were 6,994 pills.

Although there was a discrepancy in the pill count between Lieutenant Queen and Special Agent Trotter, this does not render the evidence insufficient. It has been repeatedly held that questions about the "credibility of the witnesses, the weight to be given to their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as

a trier of fact." *State v. Dotson*, 254 S.W.3d 378, 395 (Tenn. 2008)(citing *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007)); *see State v. Lewter*, 313 S.W.3d 745, 747 (Tenn. 2010); *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). The jury obviously accredited Special Agent Trotter's weight of the pills, which, as pointed out by the State, was more than twelve and a half times that necessary to support Defendant's conviction. As for Ken Wilson's involvement in the case, Lieutenant Queen testified that there was nothing indicating that Mr. Wilson tampered with the evidence in this case, and the evidence bag that Lieutenant Queen turned in did not exhibit any signs of tampering. Special Agent Trotter also testified that the bag exhibited no signs of tampering when it was submitted. The jury accredited their testimony, as was its prerogative.

The evidence was sufficient to support the conviction for possession of more that 50 grams of a Schedule II controlled substance, Dilaudid, with intent to sell. Defendant is not entitled to relief on this issue.

*Testimony Concerning the Calendar, Notes, and Nature of the Pills*

Defendant argues that the trial court erred in allowing Lieutenant Queen to testify that a calendar and notepad found in Defendant's vehicle contained handwritten notes that reflected drug transactions. He further contends that the trial court erred in allowing Lieutenant Queen to testify that he found Dilaudid pills in the vehicle when he initially thought the pills were ecstasy. However, Defendant failed to include this issue in his motion for new trial. Generally, where a party fails to include an issue in its motion for new trial, the issue is waived. Tenn. R. App. P. 3(e); *see State v. Walker*, 910 S.W.2d 381, 386 (Tenn. 1995).

Notwithstanding waiver, we find no plain error. To recognize the existence of plain error, this Court must find each of the following five factors applicable: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice. *State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (adopting the factors first articulated in *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)); *see also* Tenn. R. Crim. P. 52(b). "[A] complete consideration of all five of the factors is not necessary when it is clear from the record that at least one of them cannot be satisfied." *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007)(citing *Smith*, 24 S.W.3d at 283).

In this case, we find that factors (2) and (5) do not apply. First, no clear and unequivocal rule of law was breached. This Court has held that an officer that possesses the

necessary training, experience, and familiarity with the drug trade may testify as to matters relating to the business of buying, selling, trading, and the use of illegal drugs under Tennessee Rule of Evidence 702. *See State v. Gayle Thomas Crawford*, No. W2009-00263-CCA-R3-CD, 2009 WL 3233519 at *7 (Tenn. Crim. App. Oct. 7, 2009) *perm. app. denied* (Tenn. April 23, 2010); *State v. Daniel Potin*, No. W2005-01100-CCA-R3-CD, 2006 WL 1548672, at *4 (Tenn. Crim. App. June 7, 2006) *perm. app. denied* (Nov. 13, 2006); and *State v. Timothy Murrell*, No. W2001-02279-CCA-R3-CD, 2003-WL 21644591, at *6 (Tenn. Crim. App. July 2, 2003). In this case, Lieutenant Queen testified that he had worked in narcotics investigations since 1992, and he had conducted interdiction operations on the interstate since the beginning of his employment with the drug task force in 2000. Lieutenant Queen noted that he had found items similar to the calendar and notes in prior investigations. As to Lieutenant Queen's testimony that the pills were Dilaudid, we do not find anything improper about his testimony.

Next, for a "substantial right" of Defendant to have been effected, the error must have prejudiced Defendant. "In other words, it must have affected the outcome of the trial court proceedings." *State v. Armstrong*, 256 S.W.3d 243, 250 (Tenn. Crim. App. 2008)(citing *United States v. Olano*, 507 U.S. 725, 732-37, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)(analyzing the substantially similar Fed. R. Crim. P. 52(b)); *Adkisson*, 899 S.W.2d at 642. Here, evidence of Defendant's guilt was overwhelming due to the large amount of narcotics, that were hidden in false containers, found in the stolen vehicle that Defendant was driving. Testimony by Lieutenant Queen about the calendar and notes or that the pills were Dilaudid did not affect the outcome of the trial in this case. Defendant is not entitled to relief on this issue.

*Chain of Custody*

Rule 901(a) of the Tennessee Rules of Evidence requires that, prior to the introduction of physical evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody. *State v. Holbrooks*, 983 S.W.2d 697, 701 (Tenn. Crim. App. 1998); *State v. Goodman,* 643 S.W.2d 375, 381 (Tenn. Crim. App. 1982). "The purpose of the chain of custody is to 'demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence.'" *State v. Scott*, 33 S.W.3d 746, 760 (Tenn. 2000) (quoting *State v. Braden*, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993)). However, the State is not required to prove the identity of tangible evidence beyond all possibility of doubt. Neither is the state required to exclude every possibility of tampering. Rather, "[t]he evidence may be admitted when the circumstances surrounding the evidence reasonably establish the identity of the evidence and its integrity." *Scott*, 33 S.W.3d at 760*; see also State v. Holloman,* 835 S.W.2d 42, 46 (Tenn. Crim. App. 1992). Whether the requisite chain of custody has been sufficiently established is a matter committed to the discretion of the trial

-14-

judge, and his ruling will not be reversed on appeal absent a finding of abuse of that discretion. *State v. Beech,* 744 S.W.2d 585, 587 (Tenn. Crim. App. 1987).

Defendant argues that the State did not establish the chain of custody in this case because the "integrity and identity of the pills at issue were compromised, Queen, a self-professed drug task force officer, mistook the pills as ecstasy." He notes that Lieutenant Queen also miscounted the pills. Defendant further contends that the chain of custody was not established because the DTF Director at the time, Ken Wilson, who was later convicted of stealing evidence from the evidence room, had exclusive access to the evidence in this case and was the person who delivered it to the TBI Crime Lab for testing.

Initially, we point out that Lieutenant Queen was more than a "self-professed drug task force officer." He was employed by the 10th District DTF at the time of the offense. Lieutenant Queen testified at the suppression hearing that he initially thought the pills in question were ecstasy, a Schedule I controlled substance. However, when Lieutenant Queen mentioned ecstasy in Defendant's presence, Defendant said that they were "pharmaceutical." Lieutenant Queen then looked the pills up in the PDR and discovered that they were K4 Dilaudid pills. This fact was verified by Special Agent Trotter who tested the chemical composition of the pills. Lieutenant Queen's initial misidentification of the pills as ecstasy does not establish an unbroken chain of custody. *See State v. McKinley Wright*, No. W2007-00823-CCA-R3-CD, 2008 WL 4170033, at *5 (Tenn. Crim. App. Sept. 4, 2008) *perm. app. denied* (Tenn. Mar. 16, 2009)(officers' initial misidentification of heroin as cocaine did not preclude the establishment of an unbroken chain of custody).

Likewise, the discrepancy in the pill count between Lieutenant Queen and Special Agent Trotter is not sufficient to show a break in the chain of custody. Lieutenant Queen testified that his preliminary count of the pills was 6,702; however, Special Agent Trotter came up with a total of 6,992 pills. Lieutenant Queen was not surprised by the difference in the totals. He said: "No. I mean, it was, like I said, we did a very hurriedly count. We would make piles of either 50 or 100, and we had them scattered all over the top of a counter. And I probably just failed to count one or two of the piles." Special Agent Trotter testified that he did not physically count each pill and admitted that he would not know if the count obtained by Lieutenant Queen was correct or not, and he noted that he placed an approximate sign by the number of pills. He was more concerned with the weight of the pills, which he considered to be more accurate. He noted that he obtained the total number of pills by determining the average weight of each pill. This Court has previously held that an officer's initial erroneous count of bullets that were recovered from a residence did not preclude the establishment of an unbroken chain of custody. *State v. Jason Paul Sherwood*, No. M2005-01883-CCA-R3-CD, 2007 WL 189376, at *13 (Tenn. Crim. App. Jan. 26, 2007)

The proof in this case shows that Lieutenant Queen placed the pills in a sealed, tamper-resistant, evidence bag with his initials and deposited it into a locked evidence container. The evidence was then picked up by the evidence technician at the time, Director Ken Wilson. The proof shows that Mr. Wilson logged the evidence into the evidence room on July 9, 2002, and he took it to the TBI Crime Lab on August 16, 2002. Special Agent Trotter testified that the bag was still sealed when it was placed in the TBI evidence vault, and it remained sealed until he took it out and used a scalpel to open the bottom of the bag. Special Agent Trotter resealed the bag after analyzing its contents. Special Agent Trotter testified that he did not see any signs of tampering on the evidence bag, and he said that it would be "extremely difficult to impossible" to tamper with the bag and it not be discovered. Although there was testimony that Ken Wilson was serving a 78-month sentence in federal prison for conspiracy to deliver and distribute marijuana, which apparently involved marijuana taken from the evidence room, there was no proof that he tampered with evidence in Defendant's case. He testified that it would have been impossible for him to have tampered with the evidence because "it would show up anywhere if it had been cut or whatever on the bag..." Lieutenant Queen testified that the marijuana taken from the evidence was from a case that had already been "through the judicial process" and was ready for destruction.

The evidence does not preponderate against the trial court's finding that the State sufficiently established the requisite chain of custody for the Dilaudid pills. Defendant is not entitled to relief on this issue.

*Sentencing Issues*

On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is improper. *See* T.C.A. § 40-35-401, Sentencing Comm'n Comments; *see also State v. Arnett*, 49 S.W.3d 250, 257 (Tenn. 2001). When a Defendant challenges the length, range, or manner of service of a sentence, it is the duty of this Court to conduct a de novo review on the record with a presumption that the determinations made by the court from which the appeal is taken are correct. T.C.A. § 40-35-401(d). This presumption of correctness, however, "'is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" *State v. Carter*, 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991)). "If, however, the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow the Sentencing Act, the presumption of correctness fails," and our review is *de novo. Carter*, 254 S.W.3d at 345 (quoting *State v. Pierce*, 138 S.W.3d 820, 827 (Tenn. 2004); *State v. Shelton*, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992)).

In conducting a de novo review of a sentence, this Court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. T.C.A. § 40-35-210(b); *see also Carter*, 254 S.W.3d at 343; *State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn. 2002).

A trial court is mandated by the Sentencing Act to "impose a sentence within the range of punishment." T.C.A. § 40-35-210(c). A trial court, however, "is no longer required to begin with a presumptive sentence subject to increase and decrease on the basis of enhancement and mitigating factors." *Carter*, 254 S.W.3d at 346. Therefore, an appellate court is "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections-102 and-103 of the Sentencing Act." *Id*.

In *Carter*, the Tennessee Supreme Court clarified the 2005 changes in Tennessee sentencing law and stated:

[A] trial court's weighing of various mitigating and enhancement factors has been left to the trial court's sound discretion. Since the Sentencing Act has been revised to render these factors merely advisory, that discretion has been broadened. Thus, even if a trial court recognizes and enunciates several applicable enhancement factors, it does not abuse its discretion if it does not increase the sentence beyond the minimum on the basis of those factors. Similarly, if the trial court recognizes and enunciates several applicable mitigating factors, it does not abuse its discretion if it does not reduce the sentence from the maximum on the basis of those factors. The appellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence.

*Carter*, 254 S.W.3d at 345-46.

Thus, a trial court's "fail[ure] to appropriately adjust" a sentence in light of applicable, but merely advisory, mitigating or enhancement factors, is no longer an appropriate issue for appellate review. *Id*. at 345 (citing *State v. Banks*, No. W2005-02213-CCA-R3-DD, 2007

-17-

WL 1966039, at *48 (Tenn. Crim. App., at Jackson, July 6, 2007) (noting that "[t]he 2005 amendment [to the Sentencing Act] deleted appellate review of the weighing of the enhancement and mitigating factors, as it rendered the enhancement and mitigating factors merely advisory, not binding, on the trial courts").

Defendant was convicted of possession of more than 50 grams of a Schedule II controlled substance with intent to sell, a Class A felony. As a Range I offender, he was subject to a sentence between fifteen and twenty-five years. The trial court applied the following enhancement factors: the Defendant has a previous history of criminal convictions or criminal behavior; the Defendant before trial or sentencing has failed to comply with the conditions of a sentence involving release into the community; and Defendant was released on probation for his Texas convictions at the time of the offense. T.C.A. § 40-35-114 (1), (8), & (13). The trial court did not find any applicable mitigating factors.

Defendant argues that the trial erred in failing to find that his conduct neither caused nor threatened serious bodily injury. Tenn. Code Ann. § 40-35-113(1). This Court has held that mitigating factor (1) does not apply to an offense involving the sale of cocaine. *See State v. Holston*, 94 S.W.3d 507, 512 (Tenn. Crim. App. 2002)("Inherent within the trafficking and distribution of drugs is the potential for serious bodily injury. Although we recognize that not all drug deals involve violence, we do, however, recognize that the very nature of the act makes the potential for serious bodily injury ever present."). In *State v. Ross*, 49 S.W.3d 833, 848, (Tenn. 2001), the Supreme Court said:

> By its plain language, the section 40–35–113(1) mitigating factor focuses not on the circumstances of the crime committed by a defendant as do many of the other mitigating and enhancing factors. Rather, this factor focuses upon the defendant's *conduct* in committing the crime. Although cocaine itself may well be, in the words of the trial court, an "inherently addictive and dangerous substance," this fact alone says nothing about the appellant's criminal *conduct,* which was constructive possession of the substance located in a room several doors down from where the officers initially found the appellant. Moreover, we see no evidence in the record that the appellant actually sold or attempted to sell the drug at the time of the offense. Had either of these circumstances been present, then the dangerous nature of the drug, combined with the dangerous nature of many drug transactions, may have indeed supported the trial court's rejection of this factor as constituting a threat of serious bodily injury. As it was, however, the appellant's presence down the hall from the substance cannot be said to have threatened serious bodily injury to any person.

In this case, Defendant was in more than constructive possession of 629.58 grams of Dilaudid pills, which was more than twelve and a half times that necessary to support his conviction. The drugs were concealed in false containers, and there was evidence that Defendant had been selling narcotics as evidenced by the calendar and notes found in his vehicle. Therefore, the trial court did not err in refusing to apply this factor. *State v. Greg Harris*, No. E2003-02834-CCA-R3-CD, 2005 WL 419082, at *17 (Tenn. Crim. App. Feb. 23, 2005)("We believe the great quantity of drugs discovered and their proximity to a school zone threatens serious bodily injury and distinguishes this case from *Ross*, in which the defendant possessed 53.5 grams of cocaine."). Even if the trial court should have applied mitigating factor (1), it is entitled to very little weight. *State v. Peter Alexander Graves*, No. W2004-01525-CCA-R3-CD, 2005 WL 1683501, at *7 (Tenn. Crim. App. July 19, 2005) *perm. app. denied* (Tenn. Dec. 27, 2005).

The record clearly shows that the trial court followed the statutory sentencing procedure, made findings of facts that are adequately supported in the record, and gave due consideration to the principles that are relevant to sentencing. Based on our review, we conclude that the enhancement factors considered by the trial court adequately supported the trial court's discretionary decision to impose a sentence of twenty years for possession of more than 50 grams of a Schedule II controlled substance with intent to sell. Defendant is not entitled to relief on this issue.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
THOMAS T. WOODALL, JUDGE